Good morning, ladies and gentlemen. Our first case for this morning is FDIC v. RLI Insurance Company. Mr. Schmuchler. Thank you, Your Honor. Scott Schmuchler on behalf of Appellant RLI Insurance Company. Park National Bank extended credit to Rockwell and received a legitimate promissory note and legitimate security agreement. Unfortunately, Rockwell was unable to pay its debt and the security proved insufficient. And as a result, the FDIC seeks to use a forged lease schedule as a means of transforming the credit risk posed by an insolvent borrower into an insured risk. Insuring Agreement E, however, is not all-risk credit insurance. It's not all-risk forgery coverage. It imposes certain basic elements that the forgery has to be on an enumerated document, there must be reliance, there must be direct causation, and the FDIC must meet certain contractual deadlines. None of those elements are present in this case. So let's start with the contractual deadlines, which was your last point. But I have to say, it's very difficult for me to read Section 1821 D14 of FIREA, which says, notwithstanding any provision of any contract, and then goes on to make the six-year statute of limitation as anything but the plainest of congressional language saying that contractual limitations periods are overridden. Your Honor, that's not the position the FDIC took in FDIC v. Jones just last year when they said you can contract around the extender provision because the extender provision addresses a statute of limitations. No, no, no. It says, notwithstanding any provision of any contract. So unless a contract is capable of expressing a period of time, there's no reason even to have that. You are reading this as though it said the applicable statute of limitations, et cetera, without that first clause. And I just don't see any – I don't know how else Congress could have expressed the provision that there was going to be an extender here, and that's the plain language of the statute. Much like the states do. They void contractual limitations. The existence of a contractual deadline is not new and was not new at the time of FIREA. And yet Congress was very specific in only referencing statutes of limitation. So you think it should say, notwithstanding any provision of any contract, any period of limitations in any contract, plus – it just – it seems insane to me. No, Your Honor. That's a way of distinguishing contracts with a choice of law provision. It doesn't say – I know you argue choice of law, but it honestly doesn't say a thing about choice of law, except insofar as there might be a longer statute of limitations under state law. But we all agree we're not talking about that for several reasons. But even if, Your Honor, applies the extender statute, and we use the longest statute of limitations possible, which is actually not in FIREA, it would be under Illinois law, which for breach of contract would be 10 years. Even if the court were to apply that, we would not be – there is nothing in there to say that our contractual defenses go away, such as a notice provision, such as a proof of loss provision. Because the statute doesn't address them. The only thing the statute addresses is the period of time within which suit should be brought. Well, from our – That's very simple. From our perspective, and I think what the Supreme Court gets to in CTS is, it addresses a statute of limitations, a thing that is very specific. CTS is about statutes of limitations and statutes of repose. It really does not bear the weight you're trying to put on it. Your Honor, the courts that have looked at that, CTS in light of FIREA, say CTS defines what is and is not a statute of limitations. As opposed to a statute of repose. You can't get around this notwithstanding any provision of any contract language. Well, from our perspective, the distinction lies in Illinois law. That Illinois law draws a distinction between a statute of limitations and a contractual provision. So what if there's a federal statute that overrides it? But the question then is, what does the phrase statute of limitations mean in the context of a bank that is located in Illinois? No, it says notwithstanding any provision of any contract, the statute of limitations is in a contract claim the longer of six years or state law. And even if the statute of limitations is that, our contractual defenses remain. The question is, does that language – Except the ones that FIREA takes away. And there are certain ones FIREA takes away. FIREA has specific provisions which void specific contractual provisions, like termination upon appointment of a receiver. There is a specific provision voiding that. But from our perspective, that language simply speaks to choice of law, and it doesn't speak to voiding provisions. And if you compare it to the state law provisions, which do void contractual limitations, the distinction is remarkable. Okay. Well, you know, if that's your position, that's your position. I can't say I find it terribly compelling, but that's what you have to say. There are other defenses, and I'd like to start with reliance, because from our perspective, that presents the narrowest grounds for reversal. Park National Bank approved this credit without any information about the leases, without requiring possession of the leases, and then ultimately advances funds despite a discrepancy between the lease schedules and the certificate of incumbency. Now, your argument depends critically on the idea that it's this master agreement that is the agreement, not the actual disbursements, the two different disbursements of money. Right? Those are two different issues. There's an issue as to whether they possess the originals, and then there's an issue. They did possess. They have everything with respect to the two particular disbursements. The one that's ‑‑ I can't remember how many million dollars. They have the two lease schedules and not the master lease. They have the two lease schedules, which are actually quite complete contracts. They have, you know, all the details in them, how much is going to be paid, what the schedules are. So this is right, March 7, 2008, and then later on the smaller one, close to 3 million and 1.1 million. The question is, Your Honor, is there a sufficient factual basis from discovery to create a question as to whether they relied on those documents? And from our perspective ‑‑ And they have the originals of those two documents, and those are the two documents on which the forged signatures appear. They do have the originals, but the question ‑‑ And they had those before the monies were dispersed, didn't they? Correct. In both instances? Correct. The question is, can you use the original of one document, which incorporates another? But even if you can do that ‑‑ But you are only looking at these two disbursements of money, though. There's no forgery in the master lease agreement. Why would you care about the master lease agreement at all? Because that's the document with the material terms as to the lease. I'm not sure that it is, actually. There's all sorts of information in the actual lease documents. But that's the terms that they're now relying on to create a security agreement. The terms out of the master lease are the very terms that the FDIC says that makes this into a security agreement, which is why the incorporation, from our perspective, is improper. But you're saying that ‑‑ See, they're not trying to incorporate the document where the forgery occurs. They're trying to ‑‑ there is an incorporation of the master lease agreement, but it's just additional terms that fill in the rest of the blanks. It's like an agreement to do something in principle, and then they get down to business and they do it twice. And from our perspective, you have to look at the bank's conduct to determine reliance. You have to look at what the bank did when it approved the loan. You have to look at what the bank did when it advanced money. Right. And given that they approved the loan without any information about the leases ‑‑ So why do you say the loan? How much? Just over $4 million. But not in the master lease agreement. No, pursuant to the two lease schedules. Exactly. So you don't get an amount until you get the two lease schedules. And that's when you have, you know, a moment where there's a concrete amount, you have an assignment, you've got the security agreement at the same time, you have the evidence that the money, the $72,000 and some that's going to be paid each month is going to come supposedly from Moody and then flow through to repay the loan. You've got all the critical stuff right then. And at that moment in time, when they're faced with a certificate of incumbency saying that leases have to be signed by Rolando Chavez, and they go forward, the question is what are they relying on? And that to us is a jury question. If you look at this court's decision in Downs or the Ninth Circuit's decision in Bank of Bozeman or the Eleventh Circuit's decision in Republic, the courts look to the conduct surrounding the transaction to determine if there's reliance. In this case, a reasonable juror looking at all of the facts could say a bank that receives a document with inconsistencies and acts isn't reliant. Now, that's ultimately a jury question. Isn't that the simple negligence? It struck me that this business about whether Chavez signed or somebody else was at most an apparent authority issue or something. I don't see why somebody would be all that disturbed by that. It goes to the factors of reliance. But they rely on the actual lease. Well, therein lies the question. The question is at the moment they're advancing funds, despite this discrepancy, are they in fact reliant? That ultimately is the jury question. At a minimum, a jury question. Isn't there an undisputed fact that they checked to see if the equipment had been received? There is an undisputed fact that they did that after the money had gone out. They never checked before the money went out to make sure any of the equipment existed. They, in fact, never even on the second lease made any phone calls related to the leases until after the money is already out the door. That gets to, I think, what the district judge was getting at. It's not at all uncommon in the business world for there to be transactions, I'll say, with paper. It happens in the futures markets that you actually are trading the contracts. You're not trading the wheat. You're not trading the pork bellies. You're not trading whatever. And here the district judge says what they are relying on is, in fact, the promise of Moody to pay, the piece of paper, and digging down to the next level to look at the computer equipment, to look at all of these things is simply not what this transaction was about. Your Honor, respectfully, whether or not they do those things go to whether they're, in fact, relying on the leases. These are the factors a jury can weigh. Well, I'm not sure that's right because what worries me at a much broader level is every time you impose a more extensive duty on banks, and this, of course, at the time was Park Bank, right? The FDIC is just standing in its shoes. You increase the cost of transactions. If the bank can't just look at the lease and say, okay, there's a lease. Somebody else has agreed to pay. Then it's got to hire somebody to go investigate the background. It increases the cost. Now, maybe that should happen. That's fine. But it's a factor that we need to take into account. From our perspective, this is a contract. The parties agreed that we would cover certain dock forgeries that you relied on. And actually, I have a plain language issue for you with that because Agreement E says that you agree to indemnify for losses resulting directly from giving value based on a forged signature. If there's a security agreement, and it looks to me like this is precisely what we have here. Your Honor, I don't agree that this is a security agreement. It says on faith of, and the courts, including this court, has held that that is the equivalent of reliance. And so, ultimately, the question— It says loss resulting directly from the insured having in good faith, which we've said is a subjective standard, acquired a given value, et cetera, written original security agreement, forged signature. That's what's in Agreement E. Well, it says on faith of, and that is the equivalent of reliance. The question is, at the moment— Where does it say on faith of? Having in good faith, okay, one acquired, sold, or delivered a given value of extended credit on the faith of any written— So, in other words, yeah, they've got the written original leases. The question is, when the moment when they get the document, and there's a discrepancy, and they choose to go forward, are they relying on the document? So, you think the critical discrepancy in the lease is the lack of a Chavez signature? No, I think the two critical points on reliance are the fact that they extended the credit without any information. They didn't condition advances upon receipt. And then, when they finally receive these two lease schedules, they get one document saying Rolando Chavez is the person to sign leases, and it's signed by John Schaefer. The question is, in light of all of those facts, could a reasonable juror say the bank wasn't relying on or didn't act on faith of the documents? So, I understand. You're still back on the master lease. So, if you would just indulge me for a minute and say, how would you walk through Agreement E if we're looking at either of the two particularly, S080 or S086? There we have, they have in their possession a written original. They see where the money is going to be coming from. Maybe at most they're negligent, but the law says that negligence isn't what this is about. Right? So, how does it work if we're going to look at the particular leases? And I'm talking about the lease schedules. The lease schedules, the moment they receive it, the question is, are they acting on faith of it when they ignore discrepancy? I'm not talking about negligence. And what's the discrepancy in the lease schedules? Is it just Chavez? The Chavez. That's it. Yes. Okay. But when they act with knowledge that the leases aren't authorized by the person who has to sign them, the question is, are they acting on faith of it? From our perspective, at a minimum, a reasonable juror could look at those facts and say, if you went forward anyway, that's because you weren't actually relying on the leases. Why isn't it just as reasonable to say, or maybe more reasonable to say, if person A versus person B from the company signs, at most you're negligent for not tracing back whether, say, the president is the one who should sign it versus some other individual? Your Honor, I say I've ended my time. May I answer your question? Please. It's just rebuttal time. It may very well, a jury could look at it both ways. But when you're looking at reliance, you have to look at the factors of the conduct. And whether you want to equate them with negligence, recklessness, or whatever, those are the factors that go to reliance. And we have to be able to use the facts to question what happened at the time of the transaction. And so because it could be viewed both ways, inherently that's a question of fact that has to be resolved for a jury, not a question for summary judgment.  Thank you, Your Honor. You can save the rest of your time for rebuttal. That's fine. Mr. Brooks. Good morning, Your Honors, and may it please the Court, I am Joseph Brooks from the FDIC's Appellate Litigation Unit. So why don't you start with where Mr. Schmuchler was. What evidence is there that the bank, which I will use as the general term for both your predecessor and you, relied on these lease schedules or, you know, in good faith, you know, gave value on the faith of these lease schedules? Well, Your Honor, there's no evidence that we didn't. First and foremost, the district court expressly found that there was nothing on the face of the leases themselves that indicated that the signatures were forged. That finding has not been disputed. More importantly, the amount of money that was loaned here and the payments is exactly the amount of money that the total sum of the lease payments would equal. You're talking about for the first one, say, the $72,691.73? Sure. Or the $2.9 million, yeah. Excuse me, I didn't mean to interrupt. Yes, that's true. And if you look at the second lease, you'll see precisely the same dynamic. The amount of money to be paid monthly and the term of the lease and the amount of money to be paid monthly and the term of the loan are precisely the same. You know, there can be no question but that one relied upon the other. The issue about who signed the leases is really kind of a false issue. It is true that there is a document in the record that shows that four years earlier, Mr. Chavez was a person who could sign leases, but there's another document in the record that absolutely establishes that Mr. Schieffer was the president and gives him authority to sign at least as important documents, master purchase agreements and what have you. It's all described in our brief. I think Your Honor hit the nail on the head. In order for there to be anything at all to this argument, you must have conduct at least alleged that rises beyond the level of simple negligence, and that is not even alleged, let alone disputed in this case. So I don't believe there's anything further that we would have to say about that. Let's talk for a minute about the bank's failure to look behind the lease agreements to see whether equipment was really being delivered, whether there was any there there, so to speak. Do we need to grapple with the fictitious collateral doctrine here? No, Your Honor, for a number of reasons. Let me start off with the question of whether the bank needed to look. Keep in mind that each of these lease schedules expressly certified the receipt and the installation of the equipment. And then there was a subsequent phone call, as counsel conceded while he was up here, which confirmed Moody's, whether it was there or not, confirmed that they were there. The fictitious collateral doctrine, however, is not the law of this circuit, as shown in the Manitowoc case, which focused not only on the language of the bond there, which used the words by reason of to describe causation rather than directly resulting from, but as this court also pointed out in that case, that doctrine just does not recognize the practical reality of a transaction. Could I just say the other aspect of Manitowoc was there's a paragraph in there that cautions that one shouldn't jump too readily from one version of this bond to another. And I guess we are dealing with a later version of this agreement E than we had in Manitowoc. Well, that's true, Your Honor, but I think there are certain things we can take from it. But I think we need to go back to first principles first. This whole doctrine of fictitious collateral did not develop from the difference between by reason of and directly resulting from. As the court explained at length in Pine Bluff, and we laid out in our brief, the doctrine of fictitious collateral comes from a heightened causation standard that was first imposed by the Liberty National Bank case. And every subsequent case that has applied that doctrine or referred to that doctrine harkens back to Liberty National Bank. Well, Liberty National Bank did not rely on directly resulting from. Rather, it relied on a provision in these bonds, Section 2E, which is an exclusion. Section 2E excludes what counsel has referred to as basic credit insurance. And there's no doubt that if your claim fits within the exclusion to Section 2E, pure credit insurance is not allowed. And this doctrine emanated from that. However, Section 2E includes some very important language. It says expressly that it, that exclusion, does not apply where there is otherwise coverage under insuring agreement E. So why is Section 2E even quoted in the brief, and why is case law that relies on Section 2E even relevant to this case? It's not. So the doctrine of fictitious collateral simply is not relevant here. So is it functionally your position then that any time there's a forgery someplace, agreement E gives you coverage? It's not my position that any time there's a forgery someplace. What we have here, Your Honor, is a forgery on these lease schedules. And it was only because the bank believed that these lease schedules were legitimate that it advanced the money. Counsel tried to focus in this brief, tried to do it here again today, and said, well, you know, these lease schedules didn't even exist at the time that the bank initially approved credit. Well, this is similar to the union planner's case in the Sixth Circuit. The arrangement here was not that they came in, applied for credit, which the bank tentatively approved, and said, okay, you've met all the preliminaries. The bank said, but we will disperse funds if and only if there is a transaction that's going to require the disbursement of funds. And before we do it, we need to see a lease that identifies that the transaction is taking place, what the equipment is, what the payments will be. Most important here for the bank, as Your Honor alluded to earlier, was not the equipment or where it was. There were certifications and acceptances of that. That was Moody's concern. What the bank was primarily, if not solely, concerned about from a collateral standpoint here was the ability of Moody to make the payments in the event that its borrower, Rockwell, failed to be able to do so. And as the record points out, what the bank did here is the bank went and it reviewed the financials from Moody. It took the steps to make sure that its collateral was going to be there. And nobody has ever disputed that Moody continues to this day to be able to make lease payments on legitimate leases. So hearkening back to this Court's reference in Monotonic to the practical reality of the transaction, the practical reality here is the only reason why the bank would loan money on those leases is because it looked at the leases and they appeared to be appropriately signed and executed and represented that the transaction that was called to them was going to take place. It's just that simple. These leases have to be security agreements for you to win, don't they? Yes, they do. And yet Rockwell had something else that was real clearly a security agreement other than these leases, right? Belt and suspenders, Your Honor. Yeah. Well, so how in these leases, how do you get to a security agreement? Your Honor, you get to a security agreement by interpreting the plain and unambiguous language of the document. The document being insuring agreement E, which defines a security agreement as a document that does two things. And it has a word and, which, by the way, is not present in the UCC. It says it does two things. One, it creates an interest in personal property, which these leases clearly do. And two, it secures an ownership. Possessory interest, right? Sure. They have no ownership interest, right? Well, certainly if you're relying on that argument, no, they don't. If you treat it as if it's just what it says it is, it creates a leasehold interest. But it also creates a right for the secured party, whether it, in the first instance, was Sysex, then Rockwell, and ultimately PNB, to repossess the property and sell it and hold the lessee accountable for any deficiency on that sale in the event of default. So it also creates that possessory interest, which is critical. So, you know, accepting our argument, which Your Honor hasn't indicated that you don't, that this UCC case law is irrelevant, that's our position. Everybody agrees. It's not disputed. The language of the bond is unambiguous. There's no question that an interest, a possessory interest and or a leasehold interest, are interests created by the lease, and there's no question but that the ability to repossess that secures the performance. So it literally fits within the language of that document. And given that that language is unambiguous, both sides agree to that, anything such as case law interpreting that language in a different context, under this Court's decision in a sequia, is extrinsic evidence that shouldn't be considered. Now, Your Honor, if you were to look at the UCC, it may be an even clearer case, as it turns out. Under this Court's decision in Oryx, which is conspicuously absent from appellant's brief in this case, this is a document that creates a security interest under the UCC. There's no doubt about it. The argument that's made by the other side, which is that no lease can create a security agreement unless it has an option to purchase at nominal value, is false. And how do we know it's false? It's false because in Oryx, this Court held that a lease that, one, expressly provided that it conveyed no right, title, or interest in the property, and the property there was leased to trailers, and two, which did not have an option to purchase at a nominal value, nevertheless was, three, a security interest under the UCC. So the other side says in their 28-J letter, well, but there was a purchase option. Two points on that, and they're critical. One, a purchase option that provides for an option at a price greater than nominal value, if anything, shows that the document is not a security interest but a true lease because it demonstrates residual value. The key is that the purchase option must be at a nominal value. But two, even more importantly, in Oryx, this Court squarely relied on the 11th Circuit's decision in city lease, a case that involved a lease of video games. And in city lease, the Court found, one, there was no purchase option, and it found, two, that that agreement not only provided that there was no right, title, and interest conveyed, but it specifically required the so-called leased property to be returned at the end of the lease term. Nevertheless, city lease held, relying on eight factors, that that was still a document that created a security interest under the UCC. I can go through the factors if you like, but seven of the eight of them are present here. So there's really no question whether you, as we believe you should, simply apply the unambiguous language of the ensuring agreement E, that you have a security agreement here. Your primary argument, I thought, was that the UCC is just addressing different things and it doesn't dictate the result here. That's absolutely our argument, Your Honor, and I try to be clear on that, and I apologize if I was not. Our primary argument is so that there's no confusion. Plain language of the agreement demonstrates creation of interest, demonstrates secures obligation. UCC case law, extrinsic evidence that's irrelevant. All I'm saying is, even if this Court were to believe otherwise, it's still a security agreement. Could you touch just briefly on what Judge Wood raised, the timeliness of the lawsuit? Timeliness of the lawsuit? Well, Your Honor, nobody disputes that if the FDIC extender statute applies, the six-year statute, forget about whether there's a longer ten-year statute under Illinois law, this case was timely filed. And every court that has ever looked at this issue, the Ninth Circuit, the District of Illinois, has done just what Judge Wood did here this morning. They said, notwithstanding any provision of any contract, our friends at RLI are relying on a provision of a contract to have a reduced time in which the suit must be brought. And in our view, the plain language of that statute, as strengthened by the subsequent case law applying it, make plain that this was a timely filed lawsuit. Unless the Court has any further questions. I don't think so. So thank you very much. Thank you for your time, and we request affirmance. And Mr. Schmuchler, I'm sure you have more to say. A few things, Your Honor. I'd like to make three points. First, as to the security agreement issue, the definition of security agreement derived from the UCC. The words in Marhoffer are virtually identical to the words here, and that's why those cases, when they talk about purchase option and they talk about Did you argue in your summary judgment motion that these were not security agreements? We did. We did argue that they were not security agreements, and it's fundamentally not a security agreement because it didn't convey the property, and there's no security. All counsel talks to is a remedies provision. Well, those remedies exist regardless of the contract. The right to sue someone who breaches a contract is not security, and that's what the court in RCA gets to when it says the lack of a purchase option doesn't make this a security interest using the same words, what this court got to in Marhoffer. As to the fictitious collateral doctrine, Your Honors, the doctrine has been explored by the Ninth Circuit, the Sixth Circuit, the Eleventh Circuit, appellate courts and district courts, all of whom agree that when you have an immaterial forgery, you do not have coverage. Counsel talks to the lease schedules, but he never addresses either in his brief or today how those lease schedules would be enforceable given that there was no equipment, and at least as to the second lease schedule, it wasn't a signature by an authorized signatory of Moody. In the end of the day, the forgery in this case makes no difference. Even if they had gotten a legitimately signed lease schedule, they'd be in the very same position, and that's why the Sixth Circuit in Fork denied coverage, Bank of Bozeman, the Ninth Circuit denied coverage, Olaris, the Minnesota appellate court denied coverage, why there's a plethora of district court cases. This court is not an exception, and Manitowoc, under a substantially broader language that didn't exist in our bond and has never existed in a standard form bond, doesn't alter that result, and that's why courts continue to apply the doctrine. And it makes rational, logical sense. Of course, the district court distinguished those other cases and distinguished between what I was calling transactions where what the bank is relying on is, in effect, a contract, and whether the bank is relying on the underlying substance of that contract. Your Honor, I don't think it matters in this case, because even in a case of the court. It can matter sometimes, though, surely. In certain cases it could. It doesn't matter here, because. That's why looking at the face of the contract is so important, because if it's facially regular, then banks are entitled to rely on them. It makes no difference as to causation, because if you look at the cases involving contracts, Flagstar, which is a mortgage or note, Bank of Bozeman, which involves stock certificates, you still have to prove that the document was enforceable. So if you have a contract like this, a lease schedule, and if you accept that it's a contract, the question still is, if it was legitimately signed, could it still be enforceable? And so in this case what we've argued, and I think documented without any real rebuttal from the FDIC, is these leases, because they weren't signed by somebody authorized, and because they weren't. I would cover all forgery cases, though. You're essentially saying the bond never has to be paid. No. Because any time there's a forgery, it's presumably not enforceable. And so you say, well, it's not enforceable, it's not real, we don't have to pay. May I answer your question? You have a minute. Your Honor, I'm not saying that at all. I'm saying if you substitute the forgery for a legitimate signature, you'd be in the very same position, which demonstrates its immateriality. If you look at Beach Community Bank, which is a case that found coverage, the reason they found coverage is because the guarantee, the contract in that case, was enforceable absent a forgery. Why? Because the consideration for the guarantee, the granting of a loan to the husband, existed. Here, if you substitute the forgery on the lease schedule for a legitimate Gunter signature, they're still in the same position because Gunter didn't work at Moody at the time of the second transaction. And the first schedule isn't enforceable because there was no consideration. And that's why the fictitious collateral doctrine exists, is to distinguish between immaterial forgeries and material forgeries. And that's how you have direct causation. Thank you, Your Honor. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.